**Opinion issued December 19, 2017**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00621-CV

_____

### IN THE INTEREST OF P.M.B. AND M.A.B., CHILDREN

---

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2013-03802J

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between C.E.B. ("Mother") and her two minor sons, eight-year-old P.M.B. and seven-year-old M.A.B. The trial court also appointed the Department of Family and Protective Services ("the Department") as the boys' sole managing conservator. In three issues, Mother contends that the evidence was

not legally or factually sufficient to support termination of her parental rights or to support appointment of the Department as her sons' sole managing conservator.

We affirm.

## Background

The Department first became involved with P.M.B. and M.A.B. in February 2013. The Department received a referral that the boys' father ("Father") had become intoxicated and had hit then three-year-old M.A.B. in the face. As result, Mother took the boys to live with their maternal grandmother.

In May 2013, the Department received another referral alleging that the maternal grandmother had physically abused P.M.B. while the grandmother was intoxicated. Because of the reoccurring domestic abuse, the Department filed suit, seeking temporary conservatorship of the two boys, which was granted. Mother was provided a family service plan to assist in regaining custody of the boys.

Pursuant to the plan, Mother participated in services including parenting classes, domestic violence classes, and individual therapy. After 13 months, the boys were returned to her care. In 2015, the family court signed a decree, appointing Mother as the boys' sole managing conservator. The decree did not give Father any rights to the boys.

In March 2016, the Department received another referral, alleging physical abuse and neglectful supervision of seven-year-old P.M.B. The referral stated that P.M.B. had been observed with purple and black bruises covering his arms.

The Department filed a motion to modify conservatorship and for termination of parental rights. To support its request for temporary orders, the Department offered the affidavit of its representative, D. Brown. She testified that P.M.B. had reported that Mother's friend, Nick, had beat him at Mother's request. P.M.B. said that another of Mother's friends, Jay, also had hit him a couple of times. The referral stated that Nick and Jay had used their fists to beat P.M.B. It was reported that "the incident occurred on 3-23-16 after [P.M.B.] received a bad conduct grade at school." P.M.B. reported that he also had bruising on his chest and back, but those bruises had faded. P.M.B. also reported that he "could barely raise his arm, and indicated that he was fearful of his mother finding out that his bruises had been seen."

As requested by the Department, the trial court again named the Department as P.M.B.'s and M.A.B.'s temporary managing conservator. To facilitate the return of the children to Mother, the Department developed a family service plan for Mother to follow. The initial concerns stated in the service plan included the following: (1) physical abuse of the children; (2) Mother "does not think it is wrong to allow others to hit her children"; (3) Mother "speaks badly" to the

children and "curses them"; and (4) "services completed by the mother from [the] prior case did not benefit her."

The service plan set out several tasks and services for Mother to complete before reunification with her children could occur, including completing parenting and domestic-violence classes and individual counseling. Mother was also required to participate in a psychological examination, visit her children at CPS's office twice per month, maintain suitable housing and employment, and refrain from engaging in any illegal and criminal activities.

Mother maintained stable employment and housing while the case was pending. She participated in the services listed in her service plan, completing her parenting classes and individual therapy and attending domestic abuse classes.

Mother also participated in a psychological examination in September 2016. The psychologist's report from the evaluation includes a history of events that Mother provided to the psychologist. Mother told the psychologist that she also has a 14-year-old daughter, who has a different father than the P.M.B. and M.A.B. Mother reported that there was a history of domestic violence with her daughter's father. Mother acknowledged that CPS had investigated allegations of abuse and neglect with respect to her daughter in 2003. Mother also reported that her daughter's father had committed domestic abuse against her at the time of the CPS

investigation. Nonetheless, Mother lost custody of her daughter, who now lives with her father. Mother has not seen her daughter for 12 years.

With respect to P.M.B. and M.A.B., Mother told the psychologist that the Department originally became involved with the family in 2013 because Father had abused the boys. Mother stated that, when he was drunk, Father had "'drop kicked' [P.M.B.] in the chest and threw him out of the door, and 'open-handed' [M.A.B.] across the face." She "reported that the police were called to their home for domestic violence and indicated that [Father] was finally arrested for violating probation." Mother told the psychologist that "she only stayed in the relationship [with Father] because of their children."

Mother reported that she and the boys had then left Father and moved in with her mother. The maternal grandmother was then accused of public intoxication and striking P.M.B. She said that "CPS removed the children because she lived at her parents' home and CPS felt it was unsafe." Mother stated that she completed a family service plan, including parenting classes, domestic violence classes, and attended individual therapy. The boys were returned to her care 13 months after their removal.

With respect to the boys' most recent removal by the Department, Mother stated that P.M.B.'s school contacted the Department because P.M.B. had bruises. She said that P.M.B. had reported that "Nick and Jay beat P.M.B. up, and that

5

[Mother] watched them do this." Mother described Nick as an "ex-friend" and Jay as an "ex-boyfriend." She said that she described them as "exes" because they both had refused to speak to CPS regarding the allegations that Mother had them beat P.M.B.

The report states that Mother denied instructing Nick and Jay to beat up P.M.B. Mother indicated to the psychologist that [P.M.B.] "pulls this to get attention, and boy did he ever get the attention." Mother said that P.M.B. has ADHD and "anger issues." She described him as being "as highly aggressive." Mother reported that "[P.M.B.] will lie to get his way 'to make life difficult for me.'" And Mother "indicated that [P.M.B.] will become aggressive if he does not get his way, and noted that the majority of time [M.A.B.] was the one getting hurt."

Mother told the psychologist that P.M.B.'s bruises had resulted from his fighting with M.A.B., not from being beaten by her adult friends. Mother explained that P.M.B. had bullied M.A.B., and she had then allowed M.A.B. to push P.M.B. out a deer stand four or five times, resulting in the bruising reported to the Department. The report stated that, when the psychologist "asked about allegations that she had instructed M.A.B. to beat [P.M.B.'s] 'ass,' [Mother] indicated that she has instructed [M.A.B.] to do this." Mother told the psychologist

"that [M.A.B.] needs to stand up for himself and needs to know that he is going to have to fight if he is getting picked on."

Mother also said she "'went off' on CPS during the investigation, telling them that [P.M.B.] is lying and 'trying to play' them." Mother had then "added that she is not raising '2 punk-ass boys,'" and she "indicated that in her house 'we do have discipline.'" Mother also told the psychologist that "she does not have the physical strength to 'kick their asses like they need it.'"

At the end of the report, the psychologist concluded, "[Mother's] comments suggest that she holds and exhibits some dysfunctional parenting beliefs and behavior, including encouraging physical aggression in her children, overvaluing corporal punishment, and holding distorted beliefs regarding her children's behavior (e.g., [P.M.B.] lies 'to make life difficult for me')." The psychologist also noted that Mother "denied allowing adult males to physically assault [P.M.B.] as a form of discipline" and had "attributed this allegation to [P.M.B.] and [M.A.B.] lying." The psychologist wrote, "Should CPS and/or the court determine that this allegation is true, then [Mother's] failure to accept responsibility for this behavior (in conjunction with her placing blame on her children) would be of significant concern."

The psychologist also recommended that Mother be evaluated by a substance-abuse counselor because she had tested positive for marijuana in May

7

2016.  She also tested positive for marijuana in and September 2016.  Mother later testified at trial that she had not used marijuana; rather, she was exposed to others smoking marijuana where she worked.

Mother's service plan required her to attend supervised visits with the boys at CPS's offices.  However, in September 2016, the trial court suspended Mother's visits with P.M.B. and M.A.B. because Mother was having inappropriate conversations with the children about the case.  Mother told the boys not to take their medicine because it would make them "zombies."  She also told the boys that the Department's caseworker and the boys' foster mother were trying to take them away from her and that they would never see her again.

The Department ultimately sought to terminate the parent-child relationship between Mother and P.M.B. and M.A.B.[1]  In seeking termination, the Department asserted that Mother had engaged in conduct that endangered the children and that she had failed to comply with the family service plan.

The case was tried to the bench, beginning on March 21, 2017.  Among the documentary evidence admitted at trial was Mother's family service plan and the report from Mother's psychological evaluation.  Mother testified, and the trial court was continued until April 18, 2017.  When trial recommenced in April, the

---

[1]    The trial court also terminated Father's parental rights to P.M.B. and M.A.B. Because Father has not appealed, we discuss only the evidence pertinent to Mother's appeal.

8

Department's caseworker, D. Byrd, testified. Trial was then recessed for three months to permit the Department to nationally broadcast that the children were available for adoption. Trial resumed on July 12, 2017. Mother and Byrd both were recalled to testify.

Mother's testimony was largely consistent with the information that she had provided to the psychologist during her psychological evaluation. Mother testified that she was aware that P.M.B. and M.A.B. had reported that she had asked her adult, male friends to "beat up" P.M.B. and that she had been present when her friends assaulted P.M.B. She knew that this was the reason that the boys were taken from her care. Mother denied that this had occurred and indicated that her sons were "liars." She claimed that P.M.B. had lied about being beaten in order to "make things difficult for [her]." Mother indicated that P.M.B. wanted to be with Father and that was the reason that he had lied.

Mother admitted that she had said that she "[did] not have the strength to kick your boys' asses like they needed" but denied that she had ever asked anyone to do this for her. Mother stated that she would "never let anybody touch my kids." However, Mother acknowledged that she had "probably" told P.M.B. during CPS's investigation that he had "better recant what the f–k he said." Mother also acknowledged that she had told her two young sons "to get their shit out of [her] home . . . if they were lying" about the beating.

9

When asked why the boys had been removed from her care, Mother responded that it was because P.M.B. wanted to be with Father. Mother stated she had learned that her mother was permitting the boys to see Father without Mother's knowledge. Mother indicated that she believed that P.M.B. made up the allegations about the beating so that he could live with Father.

When asked how P.M.B. had gotten the bruises, Mother explained that P.M.B. was bullying M.A.B. while they were at her parents' house. Mother said that she "got fed up with it" and told M.A.B. to defend himself. M.A.B. then pushed P.M.B. "out of the deer stand" repeatedly, and P.M.B. "landed on the ground on his chest." After M.A.B. pushed P.M.B. out the deer stand five times, Mother stated that she intervened to stop it. Mother denied that she encouraged M.A.B. to fight; rather, she encouraged him to defend himself.

Mother answered affirmatively when asked whether she was aware that the boys "exhibited very bad aggression" and "aggressive tendencies" for their age. She attributed the boys' aggressive behavior to "everything they have witnessed" with respect to the domestic abuse perpetrated by Father when she and Father were living together. Mother testified that "[Father] beat the crap out of me and my two boys." She stated that Father had "physically inflicted wounds and bruising" on the boys. Mother described the abuse as "sustained." She stated that the police were called but no charges were ever filed against Father.

With respect to the earlier CPS investigation, Mother acknowledged that the report had been that her mother—the boys' maternal grandmother—had hit the boys while being intoxicated. Mother clarified that it had been her niece, not her mother, who had hit P.M.B.

Mother stated that she had learned that the boys were taking ADHD medication. She also testified that she had heard that their behavior, particularly P.M.B.'s behavior, had improved while in the Department's care.

Mother testified that she had completed the services required in the family service plan. She also testified that she had maintained employment and housing throughout the case. She indicated that she had her anger under better control and had learned in parenting classes that "children are still people and they still have feelings and you've got to be cautious as to how we talk to them and treat them." She also stated that she has limited the time she spends with her family and is attending church, which serves as a support group for her. When asked why things would be different this time than they had after the last time she had completed her family services, Mother stated that she would be moving away and that she would not have contact with Father.

Mother acknowledged that the trial court had suspended her visits with the boys in September 2016 but denied that she had done anything to cause the visits to be suspended. She claimed that the trial judge had told her that her visits had

11

been suspended because the judge was required to believe the Department's caseworker and not her.

At trial, the Department called caseworker D. Byrd to testify. According to Byrd, Mother's visitations had been suspended because she "would have very inappropriate conversations with the boys during the visit." Mother "talk[ed] about the case [with the boys], she would tell them not to take their medicine because it was going to make them zombies. She would tell them that myself and the current caregiver [are] trying to take them away from her and they'll never see her again."

Byrd also testified that the visits were upsetting to the boys and negatively affected their behavior. The visits usually occurred on a weekday, and the boys would go to school after the visits. Byrd said that "it caused complications at school to where there was a lot of incident reports." Byrd stated that, after the visits, M.A.B. had gone to school and had "urinate[d], multiple times, on himself, [for] no apparent reason," even when he had been asked to use the restroom. She testified that "there were occasions where they ran out [of] the schoolhouse to the middle of the street because [the boys] were so distraught of what Mom just told them."

Byrd also said that the visits negatively affected P.M.B. During the time period the Mother was visiting the boys, P.M.B. "was aggressive [and] actually

12

destroying the caregiver's home." Related to P.M.B.'s aggression issues, Byrd also testified that P.M.B. told her that he had trouble controlling his anger. Byrd said that P.M.B. would "punch the walls" and that the foster mom "has holes in her walls from [P.M.B.]."

The trial court inquired about the boys' problematic behaviors. The court asked, "I don't know what's causing their acting out, you know, their anger or whatever it is. Have they been like this their whole life or since CPS has been involved? Tell me about that." Byrd responded that "They've seen a lot for their ages[.]" The trial court asked whether Byrd was referring to "anger or are you talking about beatings?" Byrd testified, "Beatings. Like [P.M.B.] even told me at one point that he's actually jumped in between [Father] and [Mother]—to slap him because [Father's] beating [Mother] up." She continued, "They've seen a lot and with mom—with the conversations with mom during visits. Mom involved them with a lot of adult information. They don't even know how to be kids, and they're learning that with the separation from her now." Byrd testified that, since Mother's visits were suspended, M.A.B. "only urinates occasional[ly] at night, no more [during] the day. Also, "[M.A.B.] was known to flip chairs at school and run out of the school [and] there are no more issues of that." Byrd also stated that P.M.B.'s aggressive behavior had also improved since his visits with Mother were suspended. However, the boys continue to have "major behavioral issues." She

relayed that the boys "told me multiple stories of different incidents where the mother and the father were in an altercation and they felt the need to jump in the middle." She said that the boys "like to be involved in adult situations. They do not know how to be children at all."

Byrd testified that a family had been located that wants to adopt the two boys. Byrd stated that the boys visited the family, and the visit went "very well." She indicated that the family is "very caring." "They also have . . . a background [in] social work, so they are able to address any issues, behavior issues that [the boys] may have and they also have . . . resources to [obtain] services" that the boys may need. She indicated that the family was a good long-term placement "for boys with behavior issues." Byrd agreed that the family could meet the boys' "severe needs."

Byrd acknowledged that Mother had participated in the services in her family service plan, but she disputed whether Mother had satisfactorily completed the services. Byrd stated that the evaluations that she received from Mother's service providers indicated that Mother was "very resistant as far as accept[ing] . . . treatment" and "coping mechanisms" being offered to her. Byrd indicated that Mother "rejected them and [has] not heard what [the service providers] have to say."

Byrd agreed that Mother had previously completed another family service plan the first time the children were removed from her care in 2013. Byrd also agreed that Mother "didn't learn anything" from completing those services because "the kids were being abused again" when they were removed from her care the second time.

Byrd agreed that Mother had "engaged in conduct which endanger[ed] the physical or emotional well-being of her children." Specifically, Byrd cited the domestic abuse between Mother and Father to which the boys were subjected, and she cited the boys' report that Mother had her friends "beat up" P.M.B.

Byrd testified that termination of Mother's parental rights was in the boys' best interest. She stated,

> For the children to be so young, they've seen a lot they've been through a lot. [Mother] has failed to actively participate and demonstrate learned behaviors from the services that we offered. She continues to place blame on everyone else. She's yet to accept responsibility or show remorse.

> The Agency feels that we found a home, loving, nurturing and supportive for the boys, and it would give them a chance to be children that they haven't had that opportunity. So I think it is in the best interest of the children to terminate her rights.

On July 20, 2017, the trial court signed a judgment terminating Mother's and Father's parental rights, finding that termination was in P.M.B.'s and M.A.B.'s best interest. The trial court found that Mother had engaged in conduct described in Subsections D and E (both concerning endangerment of a child) of Family Code

15

Section 161.001(b)(1). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2016). The trial court did not terminate Mother's parental rights under Subsection O (failing to comply with a court-ordered service plan). *See id.* § 161.001(b)(1)(O). In conjunction with the termination of parental rights, the trial court appointed the Department as P.M.B.'s and M.A.B.'s sole managing conservator.

Mother now appeals the trial court's judgment. Father has not appealed. Raising three issues, Mother challenges the termination of her parental rights and the appointment of the Department as the children's sole managing conservator.

## Termination of Parent-Child Relationship

Mother's first issue addresses the legal and factual sufficiency of the evidence to support the trial court's findings regarding the predicate acts listed in Family Code Subsections 161.001(b)(1)(D) and (E). In her second issue, Mother asserts that the evidence was not legally or factually sufficient to support the trial court's finding that termination of the parent-child relationship was in her children's best interest.

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b). This heightened standard of review is mandated not only by the Family Code but also by the Due Process

16

Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear-and-convincing evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Section 161.001(b) of the Family Code provides the method by which a court may involuntarily terminate the parent-child relationship. *See* TEX. FAM. CODE. ANN. § 161.001(b). Under this section, a court may order the termination of the parent-child relationship if the court finds, by clear and convincing evidence, that (1) one or more of the acts enumerated in section 161.001(b)(1) was committed and (2) termination is in the best interest of the child. *Id.* Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is

17

in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).  Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights.  *In re G.A.A.*, No. 01–12–01052–CV, 2013 WL 1790230, at *7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2013, no pet.) (mem. op.).  Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266.  To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so.  *Id.*  We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible.  *Id.*  This does not mean that we must disregard all evidence that does not support the finding.  *Id.*  The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.  *Id.*  Therefore, in conducting a legal-sufficiency review in a parental-termination

case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

**B. Predicate Finding under Subsection 161.001(b)(1)(E)**

The termination of Mother's parental rights to P.M.B. and M.A.B. was predicated on, among others, a violation of Family Code Subsection 161.001(b)(1)(E). As part of her first issue, Mother asserts that the evidence was legally and factually insufficient to support that predicate finding.

*1. Applicable Legal Principles*

Subsection E of section 161.001(1)(b) permits termination when clear and convincing evidence shows that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Within the context of Subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996).

It is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See M.C.*, 917 S.W.2d at 270. However, termination under subsection 161.001(b)(1)(E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re*

*J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

"Endangerment can occur through both acts and omissions." *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied) (citing *Phillips v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.—Austin 2000, no pet.)). The statute does not require that conduct be directed at a child or cause actual harm; rather, it is sufficient if the parent's course of conduct endangers the well-being of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *R.W.*, 129 S.W.3d at 739. A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### 2. *Analysis*

Mother asserts that the evidence is "scant with respect to termination based on subsection E." We disagree.

21

Direct physical abuse may clearly endanger a child under Subsection E. *In Interest of S.l.S.*, No. 04–15–00808–CV, 2016 WL 3085910, at \*2 (Tex. App.—San Antonio June 1, 2016, pet. denied) (mem. op.) (citing *In re I.J.A.*, No. 04–09–00787–CV, 2010 WL 2403728, at \*3 (Tex. App.—San Antonio June 16, 2010, no pet.) (mem. op.)).  Here, the evidence showed that the boys were subjected to direct physical abuse.  The uncontested evidence showed that P.M.B. and M.A.B. reported that two, adult male friends of Mother had beat seven-year-old P.M.B. at Mother's request.  The reported reason for the beating was a bad-conduct grade received by P.M.B.  The evidence showed that P.M.B. had purple and black bruises covering his arms and that he reported he had bruising on his chest and back that had faded.  P.M.B. also had reported that he could barely raise his arms and that he was fearful Mother would find out his bruises had been seen.  Mother admitted saying that she does not have the physical strength to "kick [her sons'] asses like they need it."  Mother admitted that she told six and seven-year-old P.M.B. and M.A.B. "to get their 'shit' out of her home"  "if they were gonna sit there and lie."  Mother testified that she had not asked her friends to beat P.M.B.

Mother characterized her sons as liars, who wanted to make life difficult for her.  She also claimed that P.M.B. wanted to live with Father because Mother's mother had been allowing the boys to see Father.  However, the trial court, as the fact finder, was entitled to disbelieve Mother and to infer from the evidence that

22

Mother's friends had assaulted P.M.B. at Mother's request. *See In re H.R.M.*, 209 S.W.3d at 109; *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) ("[T]he court of appeals must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses.").

Even Mother's proffered explanation of P.M.B.'s bruises indicates that the boys lived, not only in an environment where violence was tolerated, but was encouraged as a means to resolve conflict. Mother testified that P.M.B. received the bruises after he had bullied M.A.B., and Mother encouraged M.A.B. to fight back. Mother then permitted M.A.B. to push P.M.B. out of a deer stand numerous times with P.M.B. landing on his chest each time. Byrd also testified that Mother encouraged the boys to engage in fights.

"[E]xposing one's child to the risk of domestic violence from others may also constitute endangering conduct." *G. M. v. Tex. Dep't of Family & Protective Servs.*, No. 03–15–00825–CV, 2016 WL 3522131, at *5 (Tex. App.—Austin June 23, 2016, no pet.) (mem. op.). The evidence showed that Father physically abused the boys before their first CPS removal in 2013. Mother described the abuse as sustained. She testified that Father "beat the crap out of me and my two boys." She stated that Father had "physically inflicted wounds and bruising" on the boys. During her psychological evaluation, Mother stated that Father had "'drop kicked'

23

[P.M.B.] in the chest and threw him out of the door, and 'open-handed' [M.A.B.] across the face." She reported that "the police were called to their home for domestic violence and indicated that [Father] was finally arrested for violating probation." Mother told the psychologist that "she only stayed in the relationship [with Father] was because of their children." This was despite the fact that she also stated that Father was abusing the children.

The evidence also showed that Mother left Father and moved in with her mother, who Mother described as an alcoholic. There, it was reported to CPS that the maternal grandmother had hit P.M.B. while being intoxicated. At trial, Mother testified that it had not been her mother, who struck her son; instead, it had been Mother's niece. In any event, evidence was presented showing that Mother had taken the boys from one abusive situation to another.

Mother also testified at trial that she had learned that, before the second CPS removal, the maternal grandmother had been allowing the boys to see Father without Mother's knowledge. From this evidence, the trial court could have inferred that Mother continued to leave the boys in the maternal grandmother's care even though the first CPS removal was precipitated by allegations that the grandmother had abused P.M.B. and was a known alcoholic. Based on Mother's testimony, the trial court also could have inferred that leaving the boys in the grandmother's care exposed the boys to possible physical abuse by Father. *See J.*

*C.-O. v. Tex. Dep't of Family & Protective Servs.*, No. 03–16–00271–CV, 2016 WL 6068263, at *7 (Tex. App.—Austin Oct. 14, 2016, pet. denied) (mem. op.) (concluding father's continued relationship with mother, which was admittedly abusive, raised doubt about his ability to be protective parent to daughter).

The evidence further showed that the boys had witnessed domestic violence between their parents. Mother testified that Father not only physically abused the boys, he had abused her in front of the boys. Evidence of how a parent has treated another child or spouse is relevant to a determination of whether a course of conduct under Subsection E has been established. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Texas courts have determined that evidence of children's exposure to domestic violence is supportive of an endangerment finding. *In re S.C.F.*, 522 S.W.3d 693, 700 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *L.M. v. Dep't of Family & Protective Servs.*, No. 01–11–00137–CV, 2012 WL 2923132, at *11 (Tex. App.—Houston [1st Dist.]. July 12, 2012, pet. denied).

The evidence also showed that the boys had aggressive tendencies, anger issues, and severe behavioral problems. Byrd attributed this in part to the fact that the boys had been subjected to domestic violence between the parents. Byrd stated that the boys "told me multiple stories of different incidents where the mother and the father were in an altercation and they felt the need to jump in the middle."

25

Byrd testified that "[P.M.B.] even told me at one point that he's actually jumped in between [Father] and [Mother]—to slap him because [Father's] beating [Mother] up." Byrd indicated that, because they had been subjected to "adult situations" and "adult information," the boys did not know how to behave like kids.

And evidence showed that Mother had a volatile temperament. Mother acknowledged that she told the boys that, if they were lying about the recent abuse, they should "get their shit out of her home." Mother admitted saying, "in a fit of rage," that she did not have the strength to kick her boys' "assess like they needed."

Mother testified that she had attended anger management counseling as had been required by her service plan. She stated, "I've got my anger under control to an extent." However, Byrd testified that Mother was hostile and aggressive with her throughout the case. Byrd stated that Mother "continues to put blame on me and said it's my fault and curses me out during her evaluations and always [shows] hostility" to me. *See In re J.L.M.*, No. 01–16–00445–CV, 2016 WL 6754779, *8 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (considering, inter alia, evidence of mother's hostility toward Department's employees during case as evidence supporting endangerment finding).

Mother points out that she engaged in and completed the services required of her in the family service plan. We note that a parent's efforts to improve or

enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under Subsection E. *Id.* Nonetheless, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, "[e]vidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future." *Jordan*, 325 S.W.3d at 724.

In her brief, Mother asserts that "engaging in services helped [her] better understand that her method of discipline can be construed as abusive in the eyes of CPS." She also stated that "engaging in services may have helped her gain insight into her [own] upbringing and her poor decision making with respect to relationships with men and the potential impact her poor judgment may have had on the physical and emotional needs of her boys." However, the Department presented evidence showing that, although she had completed services required by the service plan, Mother had not learned from the services nor embraced them. Byrd stated the evaluations that she received from Mother's service providers indicated that Mother was "very resistant as far as accept[ing] . . . treatment" and accepting "[the] coping mechanisms" being offered to her. Byrd indicated that Mother "rejected them and [has] not heard what [the service providers] have to say." Byrd also testified that Mother has not taken responsibility for the children

being removed from her care. Instead, Mother blames the children for lying about the abuse, indicating that they want to make life difficult for her. Mother also attributes the removal to P.M.B.'s desire to live with his Father. Byrd testified that P.M.B. and M.A.B. believe "that it's their fault that they're in care." Mother also blames the Department, indicating that the Department should not meddle in how she parents her children.

The evidence also showed that Mother's visits with the children were suspended in September 2016 because she continued to discuss the case with the children, despite being warned not to discuss it, and she continued to make inappropriate comments to the children, which upset the children causing them to engage in aggressive and disturbing behaviors. Thus, Mother never demonstrated with her children that the services she completed will help insure that her children are not endangered in the future.

Moreover, it is undisputed that Mother had completed a family service plan the first time the children were removed from her care in 2013. And, despite her completion of that service plan, evidence was presented showing that boys were again subject to physical abuse and removed from her care less than two years after she completed the first family service plan. The trial court could have reasonably inferred that Mother would again subject her children to physically and emotionally abusive situations, as she had in the past, even though she had

completed the required services. A fact finder may measure a parent's future conduct by her past conduct and infer that a parent who has engaged in abusive or neglectful conduct in the past will continue this behavior in the future. *See Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03–02–00653–CV, 2004 WL 903906, at *10–11 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.). As one court observed, "Past is often prologue." *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ).

We conclude that the evidence, viewed in the light most favorable to a finding of endangerment, was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct that endangered the children's physical or emotional well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's endangerment determination or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that Mother engaged in conduct that endangered the children's physical or emotional well-being. Accordingly, we hold that the evidence was legally and factually sufficient to support the Subsection E endangerment finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

We overrule Mother's first issue.[2]

## B.     Best-Interest Finding

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

### 1. *Legal Principles*

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016).  The Department has the burden to prove by clear and convincing evidence that termination is in a child's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

In *Holley v. Adams*, the Supreme Court of Texas identified factors that courts may consider when determining the best interest of the child, including: (1)

---

[2]     Because there is sufficient evidence of Subsection E endangerment, we need not address Mother's argument, challenging the sufficiency of the evidence to support the trial court's findings that Mother committed the predicate acts listed in Subsection 161.001(b)(1)(D).  *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

  2. *Analysis*

  Applying the *Holley* factors, we first observe that no evidence was presented of the children's desires. However, "[t]he absence of evidence about some of [the *Holly* factors does] not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *In re C.H.*, 89 S.W.3d at 27.

Here, multiple factors support the trial court's determination that termination of Mother's parental rights was in the children's best interest. Evidence was presented supporting the trial court's best-interest determination under the following factors: the present and future emotional and physical danger to the children; the parental abilities of the persons seeking custody; the stability of the home; acts or omissions of the parent which may indicate the existing parent–child relationship is not appropriate; and any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d at 371–72 (factors three, four, seven, eight, and nine).

The evidence, supporting the trial court's predicate finding that Mother had engaged in conduct that endangered the children's physical or emotional well-being under Subsection E, also supports the finding that termination of the parent-child relationship between Mother and her two sons is in their best interest. *See In re C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). The evidence showed that the boys were subjected to domestic abuse both as victims of the Father's physical abuse and as witnesses to the abuse perpetrated by Father on Mother. Byrd learned that the boys at times would get involved in the fights between their parents to protect Mother. *See In re O.N.H.*, 401 S.W.3d 681, 685–86 (Tex. App.—San Antonio 2013, no pet.) (considering domestic violence as evidence supporting best-interest finding).

To escape Father, Mother took the boys to live with her mother, the boys'
grandmother. However, it was reported that the grandmother, an alcoholic, had
struck then four-year old P.M.B. in the face while she was intoxicated. At that
point, the Department removed the boys from Mother's care. During that time,
Mother completed a family service plan, including attending parenting classes and
individual therapy. After 13 months, the boys were returned to Mother in
November 2014.

Sixteen months later in March 2016, the Department again received a
referral alleging that P.M.B. had purple and black bruises covering his arms.
P.M.B. and M.A.B. reported that Mother had two of her adult, male friends "beat
up" P.M.B. because he received a bad conduct grade at school. During the CPS
investigation of the incident, Mother told P.M.B. that he had "better recant what
the f–k he said." Mother also told the boys "to get their shit out of [her] home . . .
if they were lying." Byrd indicated that the boys blame themselves for being taken
away from Mother.

Mother admitted that "she does not have the physical strength to 'kick their
asses like they need it.'" Mother testified that the boys are liars and did not tell the
truth about the incident. Mother stated that the boys lied about the beating to make
her life difficult. She also claimed that the maternal grandmother had been
allowing Father to see the boys without Mother's permission. Mother said that

P.M.B. wants to live with Father and indicated that this motivated him to lie about the beating.

Mother claimed that M.A.B. had caused P.M.B.'s bruising after Mother encouraged M.A.B. to stand up to P.M.B.'s bullying. In response to P.M.B.'s bullying, Mother permitted M.A.B. to repeatedly push P.M.B. out of a deer stand before she intervened. She indicated that this is how P.M.B. became bruised.

Based on the allegations that Mother had her friends beat P.M.B., the boys were removed from her care. Mother had visitation with the boys, during which she was told not to talk about the case. Byrd testified that Mother "would have very inappropriate conversations with the boys during the visit." Mother "talk[ed] about the case [with the boys], she would tell them not to take their medicine because it was going to make them zombies. She would tell them that myself and the current caregiver [are] trying to take them away from her and they'll never see her again." Byrd indicated that the visits upset the boys and negatively affected their behavior. The trial court suspended Mother's visitation with the boys in September 2016. Byrd indicated that the boys' behavior improved after the visitations stopped. At the time trial concluded in July 2017, Mother had not seen the boys for almost nine months.

In addition, the evidence showed that Mother tested positive for marijuana during the case in May and in September 2016. Mother testified that she had not

used marijuana but tested positive because she had been exposed to customers smoking marijuana at the restaurant where she worked. Mother also failed to take a required drug test in January 2017.

Byrd also testified that Mother had been aggressive and hostile to her throughout the case. Byrd stated that Mother "continues to put blame on me and said it's my fault and curses me out during her evaluations and always [shows] hostility" to me.

The second *Holley* factor considers the emotional and physical needs of the children now and in the future. *See id.* The sixth factor considers the plans for the children by the individuals or by the agency seeking custody. *See id.* Part of the seventh factor considers the stability of the proposed placement. *See id.* Evidence was presented with respect to these factors that weighs in favor of the trial court's best-interest finding.

The evidence at trial showed that P.M.B. and M.A.B. have special needs. Both boys have ADHD and take medication. The evidence also showed that both boys have aggression and anger issues. Byrd testified that P.M.B. had been "aggressive [and] actually destroy[ed] the caregiver's home." P.M.B. had punched the caregiver's walls, putting holes in them. Byrd also testified that, after his visits with Mother, M.A.B. would urinate on himself and flip over desks at school.

E. Booth, the child advocate assigned to the case, described the boys as "hyper" and "wild." She stated, "I have talked to the teachers repeatedly as well as the [boys'] therapist, and there were pretty severe acting out behaviors[.]" However, Booth stated that the boys' behavior has "gotten better." Byrd testified that the both boys' behavior has improved since visitation with Mother was suspended. M.A.B. only occasionally wets the bed, and P.M.B. is no longer destroying the caregiver's home.

Byrd testified that a family has been found that wants to adopt the boys. She stated that the boys visited the family, and the visit went "very well." The family is "very caring," and they have "a background [in] social work, so they are able to address any issues, behavior issues that [the boys] may have. She said they also "have . . . resources to [obtain] services" that the boys may need. She indicated that the family was a good long-term placement "for boys with behavior issues, and could meet the boys' severe needs."

With regard to her plans for the boys, Mother testified,

I am actually looking at a house, today—tonight. It's a three-bedroom house in Brazoria. There's other job opportunities. I really don't mind making a one-hour drive to work. The house is right around one block, a block and a half away from the elementary school that's out there. It's very good, it's quiet. [Father] would never be able to find me at all, and I don't even talk to my parents anymore. I am on my own. The boys won't—won't be able to see any kind of violence or anything. They'll see me.

36

*Holley* factor five considers the programs available to assist the individuals to promote the best interest of the children. *See id.* Relevant to this factor, there was some evidence presented weighing against the best-interest finding. The evidence showed that Mother had completed the services in her family service plan. The evidence also showed that, as required by the service plan, Mother had maintained suitable employment and housing throughout the case as required by the service plan. On appeal, Mother asserts that it would be in the boys' best interest to return them to her care and allow her to participate in additional services.

In support of her defense, Mother called D. Bradley, a licensed therapist, to testify.[3] Bradley provided individual counseling to Mother during the pendency of the case. Bradley testified that Mother "seems to be honest and realizing some things that have taken place with her children." Bradley believed that Mother had taken responsibility "with regard to what happened in this case" and "recognizes some things that she should have done before." However, Bradley testified that Mother still denied "part of whatever the original complaint was." Bradley had asked to speak with P.M.B. and M.A.B.'s counselor's to determine whether the boys were able to participate in family therapy, but she never received information

---

[3]    In her brief, Mother also mentions that there was no evidence that a suitable relative placement could not be located with whom to place the children; however, she also acknowledges in her brief that "there are no appropriate relatives to study" for placement.

regarding how the boys were doing in their therapy. Bradley ultimately testified, "I don't have the full picture, and that's why I wanted further information from the boys' counselor and whatever other information I could get. So I only knew the piece that I was seeing her for counseling. I only had that aspect."

Bradley testified that it appeared to her that Mother cared about the boys, noting that "she talks about them frequently." Bradley stated, "So it does seem [Mother] has worked hard to get [the children] back." However, Bradly said that she could not answer whether Mother could parent the boys because "I don't know all of the pieces. I don't know living arrangements. I don't know how the boys are doing and haven't spoke to the family counselor, so I only know the piece of her coming counseling and the progress that she makes."

With regard to Mother's effort to comply with the service plan, Byrd disputed whether Mother had satisfactorily completed the services. Byrd stated that Mother's service providers had indicated that Mother was "very resistant as far as accept[ing] . . . treatment" and "coping mechanisms" being offered to her. Byrd indicated that Mother "rejected them and [has] not heard what [the service providers] have to say." Byrd also testified that Mother had not accepted responsibility for the boys being removed from her care. Instead, Mother blamed the boys and the Department for the boys' removal.

Byrd also pointed out that Mother "didn't learn anything" from the services she completed when the boys were removed in 2013 because "the kids were being abused again," resulting in the removal at issue now. From this, the trial court could have inferred that Mother did not benefit from the services she completed in 2013 and also inferred that Mother has not benefitted from the services she recently completed.

In sum, we note that there is some evidence in the record weighing against the trial court's finding that termination was in the children's best interest. However, evidence cannot be read in isolation; it must be read in the context of the entire record. *See In the Interest of K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *16 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). Here, the balance of the record reveals that Mother has a history of providing an unstable home for her children where they have been subjected to physical and emotional abuse. Evidence exists in the record showing that Mother has not taken the necessary steps to remedy the instability of her home and to address the threat of her children being again subject to abuse. As the factfinder, the trial court, after assessing the credibility of the witnesses and weighing the evidence, could have reasonably inferred that Mother would continue her pattern and practice of providing an unstable and abusive home for her children that has the potential to compromise their emotional and physical well-being.

We overrule Mother's second issue.

## Conservatorship of the Children

Mother's third issue challenges the appointment of the Department as the boys' sole managing conservator. Conservatorship determinations are reviewed for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Therefore, we reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary and unreasonable. *Id.*

Mother asserts that she should have been appointed managing conservator of the boys based on Section 153.131(a) of the Family Code. Section 153.131 creates a rebuttable presumption that a parent will be named a child's managing conservator unless the court finds that such appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development or finds that there is a history of family violence involving the parents. TEX. FAM. CODE ANN. § 153.131(a)–(b) (West 2014). Section 153.131 applies when the parents' rights have not been terminated. *See In re S.N., Jr.*, No. 05–16–01010–CV, 2017 WL 2334241, at *5 (Tex. App.— Dallas May 30, 2017, no pet.) (mem. op. nunc pro tunc); *see also In re J.A.J.*, 243 S.W.3d at 614–15. However, when the parents' rights are terminated, as here, Section 161.207 controls the appointment of a managing conservator. In that situation, the trial court appoints "a suitable, competent adult, the Department of

Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (West Supp. 2016).

On appeal, Mother argues only that she should have been appointed the children's managing conservator pursuant to the rebuttable presumption under Section 153.131(a). Because Section 161.207—not Section 151.131—applies here, Mother has failed to show that the trial court abused its discretion by appointing the Department as the children's sole managing conservator. *See id.*

We overrule Mother's third issue.

### Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Bland.